James A. Espey, suing through his father and guardian, James Q. Espey; and James Q. Espey, individually, filed an action against Convenience Marketers, Inc. ("Convenience"), alleging, among other claims, that they were entitled to damages from Convenience pursuant to Ala. Code 1975, §§ 6-5-70 and -71. James A. Espey was a minor at the time of the events that led to this case and is an incompetent. The father asserts a claim pursuant to § 6-5-70. Both the father and the son assert claims pursuant to § 6-5-71.
The trial court entered a summary judgment for Convenience. The Espeys appeal the summary judgment as to their claims pursuant to §§ 6-5-70 and -71. *Page 1222 
On December 11, 1987, between 7:30 and 8:00 p.m., Connie Price, then 16 years old, drove her automobile by the house in Tuscaloosa where James A. Espey ("Jimmy"), then 18 years old, lived with his father, and picked up Jimmy and Thomas Edward Hammock. Throughout the entire evening, Connie was the driver of the automobile.
The three rode around for a while and then decided to buy beer and gasoline. They drove to the defendant's store, a Junior Food Mart in Northport. Jimmy went into the store, paid for the gasoline, and also bought some ice and twelve 12-ounce cans of Budweiser beer. The evidence indicates that Jimmy paid for the gasoline and beer with his father's credit card.
In two affidavits, one offered by the plaintiffs to oppose Convenience's summary judgment motion and one offered by Convenience to support its summary judgment motion, Hammock gives conflicting versions of other events that occurred at the service station. In the affidavit offered by the plaintiffs, Hammock states that Connie pumped gasoline into the automobile while Jimmy was inside the store. In the affidavit offered by Convenience, Hammock states that Connie stayed in the car while Jimmy was in the store and that Jimmy, not Connie, pumped the gasoline; he further states in that affidavit that they parked the automobile in such a manner at the gasoline pumps that "we could not see the clerk and I presume the clerk in the store could not see us."
There is no further factual dispute. According to Hammock, when Jimmy returned to the automobile, he told Connie and Hammock that the store's clerk had asked him for identification to prove his age; that he had told the clerk that he had left his identification at home, but that he was old enough to buy the beer; and that the clerk then sold him the beer.
According to Hammock, the three left the Junior Food Mart and picked up Deanna Patterson, a friend of Connie's. All four then rode to a graveyard in Cottondale and then to the spillway of Lake Tuscaloosa in Northport, and they drank the beer during this time. On their way home, travelling on McFarland Boulevard, Connie was driving her automobile towards the intersection of McFarland Boulevard and Hargrove Road at 75-80 miles per hour. An automobile proceeding on Hargrove Road went through that intersection, and Connie swerved to avoid that vehicle. She lost control of her automobile, and it collided with an electric utility pole.
Connie was killed. The plaintiffs allege that Jimmy was rendered totally disabled physically and was rendered mentally incompetent. Dr. Kenneth Warner, State Medical Examiner with the Alabama Department of Forensic Sciences, performed a post-mortem examination of Connie. He testified that as part of that examination, a blood alcohol analysis was performed, and that it indicated that Connie had a blood alcohol content of .13% at the time of her death. Dr. Warner testified that, based on his experience and training, he believes that Connie was intoxicated at the time of her death.
The original complaint in this action sought recovery from the estate of Connie Price, and the complaint was later amended to include as defendants State Farm Mutual Automobile Insurance Company, West Oil Company, and Convenience. Connie Price's estate and State Farm reached a pro tanto settlement with the plaintiffs, and the trial court dismissed the claims against those defendants. The trial court entered a summary judgment for West Oil Company. This appeal involves only the plaintiffs' claims pursuant to §§ 6-5-70 and -71 against Convenience.
 I. Mr. Espey's action pursuant to the Civil Damages Act.
Enacted originally as § 2467 of the 1907 Code ofAlabama and referred to as the Civil Damages Act (seeParker v. Miller Brewing Co., 560 So.2d 1030
(Ala. 1990)), § 6-5-70 provides:
 "Either parent of a minor, guardian or a person standing in loco parentis to the minor having neither father nor mother shall have a right of action against any person who unlawfully sells or furnishes spirituous liquors to such minor and may recover such damages as the jury may *Page 1223 
assess, provided the person selling or furnishing liquor to the minor had knowledge of or was chargeable with notice or knowledge of such minority. Only one action may be commenced for each offense under this section."
Entering summary judgment for Convenience, the trial court held:
 "As to the claim under 6-5-70, there is no question that the defendant sold beer to the plaintiff's minor son. The issue thus becomes whether or not beer is a spirituous liquor under 6-5-70. Under the current state of the case law, there is no question that beer is not a spirituous liquor. (See Tinker v. State, 90 [Ala. 647, 8 So. 855].)"
The parties do not seem to dispute in this appeal that the defendant unlawfully sold or furnished beer to Jimmy, a minor, and that Convenience was chargeable with notice or knowledge of his minority. Accordingly, the dispositive issue presented in relation to the trial court's judgment on Mr. Espey's claim under the Civil Damages Act is whether, for the purposes of the Civil Damages Act, the term "spirituous liquors" includes beer. Mr. Espey, of course, contends that it does.
Citing the concurring opinion in Laymon v. Braddock,544 So.2d 900, 904 (Ala. 1989), Convenience argues that the term "spirituous liquors" in the Civil Damages Act does not include beer. To support that proposition, Convenience cites Tinkerv. State, 90 Ala. 647, 8 So. 855 (1891), and §28-3-1(15).[1] As we discuss presently, close scrutiny ofTinker and § 28-3-1(15) indicates that, except perhaps for dictum in Tinker that actually supports Mr. Espey's position, neither Tinker nor the Code provision is appropriate for determining the meaning of "spirituous liquors" in the Civil Damages Act. Instead, to determine whether the Legislature intended to include beer in the meaning of "spirituous liquors" in the Civil Damages Act, we must look to other case law and consider the historical context of Alabama's Prohibition movement, during which the Civil Damages Act was enacted.
Tinker, decided in the November 1890 term of this Court, involved an appeal from a conviction for selling "liquor" without a license. The statute involved in that case was a general law of local application that addressed "preventing the sale or giving away or otherwise disposing of spirituous or vinous liquor"; the alleged illegal sale involved lager beer, which the Court "judicially knew" to be "malt liquor." The trial court charged the jury that the sale of the lager beer was a violation of the prohibitory statute. The Court reversed the judgment and remanded the cause, because, it held, lager beer, which was "malt liquor," was not addressed by the statute, which addressed instead, the sale of "spirituous and vinous liquor." The Court, basing its holding on Allredv. State, 89 Ala. 112, 8 So. 56 (1890), held that "spirituous liquor means that which, in whole or in part, is composed of alcohol extracted by distillation." 90 Ala. at 648,8 So. at 855.
Although at first glance that holding might seem dispositive of the issue we address today, closer scrutiny reveals that it is not. For its definition of spirituous liquor,Tinker cited Allred, which was decided the year before Tinker, in the November 1889 term. InAllred, Dr. Allred was indicted and convicted for retailing "spirituous," "vinous," or "malt" liquors, or "intoxicating bitters," without a retailing license. The statutes involved were §§ 629(3), 4036, and 4037 of the 1887Code of Alabama. Section 629(3) is found in Title 7, Chapter 9, Article I. Chapter 9 specifically addressed "Licenses" and Article I specifically addressed "Businesses and callings for which licenses are required." Section 629(3) provided:
 "3. For retailers of spirituous, vinous, or malt liquors in any city, town, village, or any other place, of less than one thousand inhabitants, one hundred and twenty-five dollars; in any city, town, or village *Page 1224 
of more than one thousand, and less than three thousand inhabitants, one hundred and seventy-five dollars; and in any city or town containing three thousand or more, and less than ten thousand inhabitants, two hundred and fifty dollars; and in any city of more than ten thousand inhabitants, three hundred dollars. But dealers in lager beer exclusively shall be charged one-fourth of the above rates. Any person who pays for and takes out a license as a retailer, shall not be required to pay for, and take out a license as a wholesale dealer in such liquors; and when a retail license is taken out after the first day of January, and before the first day of July, the price of the license shall be the same as for a license for twelve months. Any person who sells or disposes of spirituous, vinous, or malt liquors, or intoxicating bitters, in any quantity less than a quart, shall be deemed a retail dealer."
Sections 4036 and 4037 were located in Title 2, Chapter 7, Article 13. Chapter 7 addressed "offenses against public morality and decency," and Article 13 addressed "Disposing of Liquor Illegally and Violating Prohibitory Laws." Section 4036 provided:
 "Retailing or selling vinous or spirituous liquors without license. — Any person, who, without license as a retailer, sells spirituous, vinous, or malt liquors, in any quantity less than one quart, or in any quantity, if the same, or any portion thereof, is drunk on or about his premises, must, on conviction, be fined not less than fifty, nor more than five hundred dollars, and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months."
Section 4037 provided:
 "Forms of indictment for retailing, and violating special prohibitory laws; proof of retailing. — In any indictment for retailing spirituous, vinous, or malt liquors without license it is sufficient to charge that the defendant sold spirituous, vinous, or malt liquors without a license, and contrary to law; and on the trial any act of retailing in violation of the law may be proved; and for any violation of any special and local laws regulating or prohibiting the sale of spirituous, vinous, or malt liquors within the place specified, such form shall be held good and sufficient."
These related licensing and criminal statutes specifically listed as distinct types of liquors "spirituous," "vinous," and "malt" liquors. Section 629(3) provided for licensing fees for retailers of those kinds of liquors; §§ 4036 and 4037 provided for enforcement of § 629 by providing criminal penalties for failure to comply with § 629. In this context, remembering that the statutes themselves delineate between three types of "liquors," consider what the Court inAllred said:
 "The appellant was convicted under an indictment which charged him with engaging in or carrying on the business of retailing spirituous, vinous, or malt liquors, or intoxicating bitters, without a license. The evidence went to show that he engaged in and carried on the business of selling a compound called 'Busby's Bitters,' which he sold in quantities less than a quart. The evidence also tended to show that this bitters was an intoxicating liquor, and was purchased from defendant to be used, and was used, as a beverage. It was not shown what ingredients entered into the composition of the bitters. It does not appear that it was composed of any part of either vinous, spirituous, or malt liquors. On this state of proof, the following charge was given at the instance of the state, and excepted to by the defendant: 'If the defendant in this county, and within the time covered by the indictment, did engage in or carry on * * * the business of selling intoxicating bitters, commonly called "Busby's Bitters," in a place of less than one thousand inhabitants, in quantity less than one quart, then the defendant is guilty, as charged, if it was purchased and used as a beverage.' The giving of this charge was, in our opinion, an error for which the judgment must be reversed. The statute requires a license for engaging in the *Page 1225 business of selling vinous, spirituous, or malt liquors. Code, § 629. The offense involved in carrying on such business without a license can of course only be committed by the sale of liquors of one or another of the classes specified. The liquor sold must be either 'spirituous,' 'vinous,' or 'malt.' We do not understand either of these terms to be synonymous with 'intoxicating liquors,' or 'intoxicating bitters.' 'Spirituous liquors,' technically and strictly, include all liquors which contain alcohol in appreciable quantities. In this sense, vinous and malt liquors are also spirituous, in that each contains spirits of alcohol. People v. Crilley, 20 Barb. 248; State v. Giersch, 98 N.C. 720, 4 S.E.Rep. 193. But, in ordinary acceptation, the term 'spirituous liquors' imports distilled liquors and that the term is employed in this sense in the statute under consideration is manifest from the use of the superadded terms 'vinous' and 'malt,' which have no office to perform unless the phrase 'spirituous liquors' is confined to the definition which it has in common parlance, denoting liquids which are the result of distillation. Attorney General v. Bailey, 1 Exch. 281. 'Vinous liquors' are such as are made from the fermented juice of the grape. Worley v. Spurgeon, 38 Iowa, 467; Adler v. State, 55 Ala. 24. The term 'malt liquors' embraces porter, ale, beer, and the like, which are the result or product of a process by which grain, usually barley, is steeped in water to the point of germination, the starch of the grain being thus converted into saccharine matter, which is kiln dried, then mixed with hops, and, by a further process of brewing, made into a beverage. Liquor of either class may be intoxicating; but neither class, nor all of them combined, include all intoxicating liquors, beverages, or bitters. A given liquor may, in other words, be in a high degree intoxicating, and yet be neither spirituous, vinous, nor malt, within the sense of the statute. Certainly we cannot judicially know that Busby's Bitters, though shown to be intoxicating, is or contains either distilled liquor or wine, or a 'liquor prepared for drink by the infusion of malt.' It was for the jury to say whether the bitters proved to have been sold by the defendant was vinous, spirituous, or malt liquor, or contains liquors of either or all of these classes in appreciable quantities. The charge took this inquiry away from them, and required at their hands a verdict of guilty, if they found the liquor to be intoxicating simply, although they might also have believed that, notwithstanding its inebriating qualities, it was not within the terms of our statute."
89 Ala. at 112-13, 8 So. 56-57 (emphasis added).
As the Court wrote in Allred, the trial court charged the jury on "intoxicating liquors," although the statutes involved addressed, instead, "spirituous," "vinous," and "malt" liquors. Confronted with that charge, the Court had to define "spirituous," "vinous," and "malt" for the purposes of the statutes involved, in order to determine if those types of liquors meant the same thing as "intoxicating" liquor, concerning which the trial court charged the jury. In that context, the Court announced the definition of "spirituous liquor" that Convenience argues should be used to define the term "spirituous liquors" in the Civil Damages Act.
This discussion, however, reveals that the definition of "spirituous liquors" upon which Convenience relies had nothing to do with the Civil Damages Act; instead, the definition was related to § 629, a licensing statute that for the purpose of license fees listed three distinct types of liquors, "spirituous," "vinous," and "malt" liquors, and §§ 4036-4037, which likewise listed as distinct types of liquors "spirituous," "vinous," and "malt" liquors and provided for the enforcement of § 629 by criminal penalties for failure to comply with that section. The progeny of Allred andTinker also reflect that the term "spirituous liquors" in Allred and Tinker was related to a specific classification of "liquor," as opposed to other intoxicants, in licensing and criminal
statutes, not the Civil Damages Act. *Page 1226 Bouyer v. City of Enterprise, 4 Ala. App. 276,58 So. 755 (1912) (although Bouyer did not directly address the definition of "spirituous liquors," it cited Allred;Bouyer involved an alleged violation and a subsequent conviction for violating an ordinance concerning selling without a license "spirituous, vinous, or malt liquors, or intoxicating drink"); Marks v. State, 48 So. 864,159 Ala. 71 (1909) (appeal of conviction under criminal statute; defines "spirituous," "vinous," and "malt" liquors and intoxicating bitters for purposes of Act 53, Ala. Acts 1907, Special Session, which was a statewide prohibition statute making it illegal, except in limited instances, to "manufacture, sell, barter, exchange, give away to induce trade, furnish at public places or otherwise dispose of spirituous, vinous, or malt liquors, intoxicating bitters");Lambie v. State, 151 Ala. 86, 44 So. 51 (1907) (indictment and conviction under Act 13, Ala. Acts 1892-93, for selling "spirituous, vinous, or malt liquor" without a license); Dinkins v. State, 149 Ala. 49, 43 So. 114
(1907) (indictment and conviction for sale of "malt" liquor, which was prohibited by Act 273, Ala. Acts 1886-87, and § 5077, 1896 Code of Alabama, which was the recodification of § 4037, 1887 Code of Alabama, one of the code sections involved in Allred);Roberson v. State, 100 Ala. 123, 14 So. 869 (1894) (indictment and conviction for disposition of "intoxicating liquor" without a license); Harrison v. State, 91 Ala. 62,10 So. 30 (1890) (indictment and conviction for selling liquor without a license); Brantley v. State, 91 Ala. 47,8 So. 816 (1891) (indictment and conviction under local prohibitory act, Act 284, Ala. Acts 1886-87, for selling either spirituous, vinous, or malt liquors or intoxicating bitters within one mile of a church).
In Sarlls v. United States, 152 U.S. 570,14 S.Ct. 720, 38 L.Ed. 556 (1893), the United States Supreme Court citedTinker in a manner consistent with the preceding discussion. Sarlls was convicted for violating a federal statute by selling lager beer, which the indictment averred was a "spirituous liquor," to the Choctaw Indians in "Indian Country"; that statute provided that it was illegal to provide "spirituous liquor or wine" to "Indian Country." The Court stated that the issue presented was whether lager beer was a "spirituous liquor or wine"; it ultimately determined that lager beer was neither. The Court wrote:
 "The only evidence on this subject, disclosed by the record, was to the effect that lager beer is a malt liquor, and is intoxicating. To enable us to solve the question we must look to the popular signification of the terms used, and also to the phraseology of other statutes of the United States in which like terms appear. We are likewise entitled to any light that may be thrown on the subject by the decisions of respectable courts which have had to construe similar terms in penal statutes.
 "Looking to other statutes of the United States, we find that the terms 'spirituous liquors' or 'distilled spirits,' and 'malt liquors,' are not used as synonymous. On the contrary, they are treated as different substances, and in the system of revenue restrictions, in providing for their manufacture and sale, they are regarded as distinct. Thus, in section 3244, Revised Statutes, it is provided, 'Wholesale dealers in malt liquors shall pay fifty dollars. Every person who sells or offers for sale malt liquors in larger quantities than five gallons at one time, but who does not deal in spirituous liquors, shall be regarded as a wholesale dealer in malt liquors.' And in the same section it is enacted that 'every person who manufactures fermented liquors of any name or description for sale, from malt, wholly or in part, or from any substitute therefor, shall be deemed a brewer,' and 'shall pay one hundred dollars;' and 'rectifiers of distilled spirits shall pay two hundred dollars;' 'wholesale liquor dealers shall pay one hundred dollars,' and 'wholesale dealers in malt liquors shall pay fifty dollars.'
 "Such provisions seem to plainly distinguish 'malt liquors,' the product of fermentation, from 'spirituous liquors,' the result of distillation. *Page 1227 
 "Most of the decisions to which our attention has been directed are to the same effect.
". . . .
 "In Tinker v. State, (Alabama,) [90 Ala. 647] 8 South.Rep. 855 [1891] it was said: 'Malt liquors have neither vinous nor spirituous liquors as an ingredient. Spirituous liquors, vinous liquors, and malt liquors are not synonymous terms, but each refers to a liquor separate and distinct from each other. Lager beer is a malt liquor, and the courts take judicial notice of the fact. The statute having prohibited the sale of spirituous and vinous liquors only, malt liquors are not included. It was error, therefore, to charge the jury that a sale of lager beer was in violation of the statute.'
 "There are other cases in which the terms were similarly construed by state courts, but which it is unnecessary here to cite.
 "To the contrary of these definitions and decisions, the principal case is that of State v. Giersch, [98 N.C. 720], 4 S.E.Rep. 193, the reasoning and conclusion wherein were adopted by the court below. That was a case where a statute of North Carolina (Code, §§ 3110, 3116) prohibited the introduction and sale of spirituous liquors, and the court held those terms to be generic, and to include all intoxicating liquors containing alcohol, whether distilled, fermented, or vinous.
 "The reasoning on which such a conclusion is reached excludes the common and popular signification of the words, and finds the meaning of the statute in the fact, true in a scientific sense, that alcohol is found in fermented, as well as in distilled, liquors, and that the purpose of the statute is to prevent the mischief occasioned by the use of intoxicating drinks.
 "We cannot agree with this method of reading a penal statute. The purpose of such a statute is to notify the public of the legislative intent, not to furnish scientific definitions. That intent is, in most cases, to be found by giving to the words the meaning in which they are used in ordinary speech.
 "Nor can courts, in construing penal statutes, safely disregard the popular signification of the terms employed, in order to bring acts, otherwise lawful, within the effect of such statutes, because of a supposed public policy or purpose. . . .
 "There is a difference, overlooked by the court below, between the language of the North Carolina statute and of section 2139, in that the former uses only the words 'spirituous liquors,' but in the latter the words are 'spirituous liquors or wines.'
 "That by the term 'spirituous liquors,' used alone in a statute, it may with some plausibility be contended the legislature meant to signify all intoxicating drinks. But the case is quite different when 'wines' are added to the articles prohibited. In that case it is evident that the legislature did not think that all intoxicating drinks were included in the term 'spirituous liquors,' or they would not have named 'wines.' Under the construction put by the court below on the words 'spirituous liquors,' as including all liquors that are intoxicating, and hence as including lager beer, the word 'wines' is useless in the statute."
152 U.S. at 571-75, 14 S.Ct. at 720-22 (emphasis added).
Accordingly, even the United States Supreme Court indicated that Tinker gave the definition of "spirituous liquors" for the purposes of criminal statutes;
moreover, the Court's discussion and holding indicate that federal criminal and alcohol-regulatory statutes at the time ofAllred and Tinker made the same distinctions between "liquors" that the Alabama statutes and cases made.
Our discussion shows that Allred andTinker's definition of "spirituous liquor" was based on licensing and criminal statutes that specifically delineated between various types and classes of "liquors." The Civil Damages Act is neither a criminal statute nor a licensing provision. Instead, both as it was originally enacted, and as it exists recodified today, the Civil Damages *Page 1228 
Act is a provision that creates a cause of action. As originally enacted, the provision was located in the "Torts" portion of the Code; now it is located in AlabamaCode 1975 in Title 6, which addresses "Civil Practice," and in Chapter 5, which is entitled "Actions" and which includes the statutory right to various actions, such as, for example, wrongful death, § 6-5-410, and fraud, deceit, and misrepresentation, § 6-5-100 et seq. Accordingly, it is inappropriate to conclude, as Convenience does, that the definition of "spirituous liquors" found in Allred andTinker is necessarily the definition that the legislature intended for the term "spirituous liquors" in the Civil Damages Act.
With the previous discussion in mind, consider Convenience's citation to § 28-3-1(15), Convenience's major authority for its argument apart from Tinker. Section 28-3-1(15) provides this definition of "liquors":
 "Any alcoholic, spirituous, vinous, fermented, or other alcoholic beverage, or combination of liquors and mixed liquor, a part of which is spirituous, fermented, vinous or otherwise alcoholic, and all drinks or drinkable liquids, preparations or mixtures intended for beverage purposes, which contain one-half of one percent or more of alcohol by volume, except beer and table wine."
(Emphasis added.) Title 28 addresses "Intoxicating Liquor, Malt Beverages, and Wine" and, in addition to Chapter 3, which covers "Regulation and Control of Alcoholic Beverages in Wet Counties," Title 28 has chapters providing for "Elections as to Sale and Distribution of Alcoholic Beverages Within Counties and Cities" (chapters 2 and 2A), "Alcoholic Beverage Licensing Code" (chapter 3A), and other chapters concerning the regulation of the production, sale, and distribution of alcoholic liquids. A review of the substance of the provisions of Title 28 indicates that, like Allred andTinker, § 28-3-1 gives a specific definition that is associated with specific regulatory statutes that are not related to the Civil Damages Act. Furthermore, § 28-3-1
itself limits its field of application to three provisions in Title 28: Title 28, chapter 3, the Alabama Table Wine Act, and the Alcoholic Beverage Licensing Code, § 28-3A-1 et seq. Even within those provisions, § 28-3-1 itself allows the definition to be modified if "the context clearly indicates otherwise." § 28-3-1. Accordingly, we find that §28-3-1(15)'s definition of "liquor" is not determinative of the definition of the term "spirituous liquors" in the Civil Damages Act.
To summarize the discussion so far, we find that Convenience's analysis is inappropriately simple, because it focuses only on certain statutory and case law definitions of "spirituous liquors" without recognizing the context from which those definitions come. Our discussion of that context — regulatory, licensing, and criminal statutes — reveals that the definitions are not determinative of the definition of the term "spirituous liquors" in the Civil Damages Act. Accordingly, we do not accept Convenience's argument.
That does not necessarily mean that we accept Mr. Espey's argument either, however. Mr. Espey contends that at the time the Civil Damages Act was enacted, the use of the term "spirituous liquors" by itself in a statute, as the Legislature used the term in the Civil Damages Act, embraced all liquors or beverages containing alcohol, while its use along with other classes of liquors — for example, malt or vinous liquors — confined its meaning to liquors made by the process of distillation.
Mr. Espey cites dicta in Allred andTinker to support his argument. In Allred, the Court wrote:
 " 'Spirituous liquors,' technically and strictly, include all liquors which contain alcohol in appreciable quantities. In this sense, vinous and malt liquors are also spirituous, in that each contains spirits of alcohol. People v. Crilley, 20 Barb. (N.Y.) 248; State v. Giersch, 98 N.C. 720 [4 S.E.Rep. 193]. But, in ordinary acceptation, the term 'spirituous liquors' imports distilled liquors; and that the term is employed in this sense, in the statute under consideration, is manifest from the use of the superadded terms 'vinous' and 'malt,' which have no office to perform, *Page 1229 
unless the phrase 'spirituous liquors' is confined to the definition which it has in common parlance, denoting liquids which are the result of distillation."
89 Ala. at 113, 8 So. at 56-57.
In Tinker, the Court wrote:
 "Spirituous liquor, in its extended meaning, may include all liquors composed in whole or in part of alcohol, for such liquors partake of a spirituous quality; and the particular phraseology of a statute may show the legislature intended to use it in this extended meaning. State v. Giersch, 98 N.C. [720,] 724 [4 S.E. 193]."
90 Ala. at 647-48, 8 So. at 855.
Also, in Sarlls, supra, the United States Supreme Court wrote "[t]hat by the term 'spirituous liquors', used alone in a statute, it may with some plausibility be contended the legislature meant to signify all intoxicating drinks."152 U.S. at 575, 14 S.Ct. at 722.
We have already established that the holdings ofAllred and Tinker are not determinative of the definition of "spirituous liquors" in the Civil Damages Act. Although the dicta in those cases and inSarlls may be instructive on the definition of "spirituous liquors," it is not determinative of that definition. To determine whether the legislature meant to include beer in the term "spirituous liquors" in the Civil Damages Act, although we should consider what the Court said inAllred and Tinker because the legislature may have been aware of the cases, we must also consider the tone of the time during which the Civil Damages Act was enacted and the logic of excluding beer from the coverage of Civil Damages Act. By taking an overall look at the Civil Damages Act, we avoid the mistake of oversimplifying, as both Convenience and, to a lesser extent, Mr. Espey did in their arguments.
The Civil Damages Act was enacted as § 2467 of the 1907Code of Alabama. As we will discuss, 1907 was a year of monumental success and zeal for the Prohibition movement in Alabama. J. Sellers, The Prohibition Movement in Alabama,1702 to 1943, 92-124 (1943); S. Hackney, Populism toProgressivism in Alabama, 302-05 (1969).
As a brief background to the events of 1907, consider that the sentiment favoring Prohibition began to grow in Alabama in the 1880s. With the establishment of the Alabama chapter of the Anti-Saloon League in 1904, the Prohibition movement in the state began to gather momentum. The Anti-Saloon League, given impetus by churches, was aggressive and well organized, and it quickly became powerful. Sellers, supra, at 102-03. In 1906, as regarded the sale of alcohol, there were four types of counties: 21 counties that had total prohibition by special act of the Legislature, 21 counties where various licenses were required to sell alcohol, 16 counties where only the county itself sold alcohol through a "dispensary," and 9 counties that had both dispensaries and saloons that operated by license arrangements.
Although total prohibition was the ultimate goal of the Anti-Saloon League and it was determined to push steadily towards that goal, the League was also determined not to push for more Prohibition legislation than popular sentiment supported. Accordingly, in 1906 the Anti-Saloon League prepared, as its first major legislation, a bill that provided that if one-fourth of the voters of any county should apply to the probate judge, he must order an election for that county on the issue of prohibition of the sale of alcohol in that county; in other words, the proposed legislation gave each county the local option to prohibit the sale of alcohol, although counties with dispensaries were excepted for two years.Sellers, supra, at 104; Hackney, supra, at 303.
The legislation was introduced in the Alabama House in January 1907. The manufacturers, distributors, and retailers of alcohol were strongly opposed to the legislation, of course, and the alcohol industry sought vigorously to defeat the bill. After several days of emotional testimony before the House Temperance Committee by Prohibition supporters and two speeches by lawyers representing the alcohol industry, the House approved the legislation by a vote of 81-2. Sellers, supra, at 108. The *Page 1230 
Senate amended the bill to say that elections on the local option might be held every two years and passed the legislation by a vote of 22-0. Senate Journal, 1907, pp. 1031-63. The House approved the bill as amended, and Governor Braxton Bragg Comer signed the legislation, which is Act 149, Ala. Acts of 1907. Later, in separate legislation, the legislature repealed the two-year exemption for dispensaries.
Coosa County was the first to try this new local option law, and the Prohibition referendum in that county passed by a landslide. Elections in Butler, Pickens, Talladega, and Tuscaloosa Counties followed, and in each county the Prohibitionists won landslide victories. Encouraged and admittedly surprised by the speed and margin of its success, the Anti-Saloon League decided to push onward for total statewide Prohibition. When rumors began circulating that Governor Comer would call a special session of the legislature to deal with railroad regulations, the Anti-Saloon League determined to convince Comer, who was generally a supporter of Prohibition, to include total statewide Prohibition legislation in the agenda for the special session.
As the time approached for Comer to convene the special session, Prohibitionists won landslide victories in nine more county local option elections; the Prohibitionists claimed a major victory by winning in Jefferson County, the most populous county in the state and a county thought by the alcohol industry to be able to resist the Prohibitionist forces. With the impetus from consistent landslide victories in the local option elections, the Anti-Saloon League and other Prohibitionist groups drafted proposed legislation to abolish all forms of legally manufacturing, distributing, or retailing alcohol. In early November 1907, on the first day of the special session, A.H. Carmichael, Speaker of the House and a Prohibitionist, introduced a bill
 "To prohibit the manufacture, sale, barter, exchange, giving away to induce trade, the furnishing at public places or otherwise disposing of any alcoholic, spirituous, vinous or malt liquors, intoxicating bitters or beverages, or other liquors or beverages by whatsoever name called which if drunk to excess will produce intoxication, except the sale of alcohol in certain cases upon certain conditions [for medical purposes], and except the sale of wines for sacramental purposes."
Act 53, Special Session, Ala. Acts of 1907.
Although those opposed to total statewide Prohibition were strongly opposed,[2] the opposition does not appear to have been very widespread. The House passed the bill by a vote of 66-25 and the Senate passed it by a vote of 32-2. The legislation's effective date was set as January 1, 1909.Sellers, supra, at 121.
Even with the passage of the total statewide Prohibition bill, the Prohibitionists continued to force local option elections, then win them in landslide victories. By the end of the year, December 31, 1907, only 17 of Alabama's 67 counties permitted any sale of alcoholic beverage. Sellers, supra, at 123. Accordingly, for the Alabama Prohibition movement, 1907 was a year of spectacular success: in one year, the legislature passed the Prohibitionists' long-sought local option law, and 29 of the 46 counties that allowed the sale of alcohol responded by voting for county-wide Prohibition; in the same year, the legislature passed legislation establishing total statewide Prohibition.
In that year, the legislature enacted the Civil Damages Act as a provision of the 1907 Code of Alabama.
Considering the tone of the times in which the statute was enacted as a provision of the Code and considering the statute on its face, we hold that the Civil Damages Act is a "temperance" or "prohibition" provision, intended to deter the sale of "spirituous liquors" to minors, to deter the intoxication of the minor that would result from such a sale, *Page 1231 
and to provide a remedy for the aggrieved parties that the Act describes.
Given this purpose, we can discern no reason why the legislature would have intended the application of the Civil Damages Act to be restricted only to a case involving the sale of distilled liquors, not beer. Indeed, we conclude that the legislature intended the opposite; given the purpose of the statute, the legislature must have meant for the term "spirituous liquor" to include beer, because to hold otherwise would defeat the purpose of the statute. Although State v.Giersch, 98 N.C. 720, 4 S.E. 193 (1887), likeTinker and Allred, involved an appeal concerning a criminal statute, we find the language and reasoning of that case in addressing whether "spirituous liquor" means only distilled liquor to be instructive in our discussion today:
 "If the purpose of the statute is to prevent drunkenness by prohibiting the sale of spirituous liquors, is it not plain to the mind of the simplest observer that such purpose would only be partially served by preventing the sale of only distilled liquors. Fermented and vinous liquors — lager beer and wine — are spirituous liquors, and produce intoxication and drunkenness as certainly as distilled liquors produce the like effect. It simply requires the greater quantity of them to do so. Can it be said with any show of reason that the legislature would have intended to cripple, prevent, and hinder its purpose by prohibiting the sale of one kind of intoxicating spirituous liquors, and not another? Can any just and fair mind reach the absurd conclusion that it intended to prevent drunkenness by prohibiting the sale of distilled spirituous liquors, and to allow, and, in practical effect, encourage, drunkenness by the toleration of the sale of fermented and vinous spirituous liquors? And if, for any reason, it had such mixed, contradictory purpose, would it not have said so, — so provided as to leave no doubt as to such partial purpose? The presumption is, it intended to further and accomplish, not hinder and defeat, its plain purpose."
98 N.C. at 722-23, 4 S.E. at 194-95.
Aside from the fact that it would contradict the purpose of the Civil Damages Act to exclude beer from the meaning of "spirituous liquor," as a matter of common sense it would make no sense to conclude that the legislature intended the term "spirituous liquors" in the Civil Damages Act to mean only distilled liquors, not beer.[3] Notwithstanding Convenience's arguments, now shown to be inaccurate, concerning the definition of "spirituous liquors" and some dictionaries' definitions of "spirituous liquors," nothing indicates that the legislature intended the term "spirituous liquors" in the Civil Damages Act to apply only to distilled liquor, not beer. Logic, the purpose of the statute, and the historical context of the enactment of the Civil Damages Act all demand that beer be included within the meaning of "spirituous liquors" in the Civil Damages Act. Accordingly, we hold that for the purposes of the Civil Damages Act the term "spirituous liquors" includes beer.
Furthermore, notwithstanding the discussion so far, compelling public policy defeats Convenience's arguments and requires that beer be included within the meaning of "spirituous liquors" in the Civil Damages Act. If we held otherwise, the net result would be that no cause of action could be maintained under the Civil Damages Act for injuries caused by a seller or furnisher of alcoholic beverages to any minor in this state, if those beverages were produced by a means other than distillation. In other words, a retailer could escape civil liability for selling intoxicants to minors by restricting those sales to wine, beer, "wine coolers," and other non-distilled beverages.
Today our society is confronted with a tremendous number and variety of alcoholic beverages. Wine coolers and beer packaged *Page 1232 
in carry-out cartons are available on almost every corner and in the neighborhood grocery. Hundreds of millions of dollars are spent annually to promote dozens of brands of beer and wine. "Happy hours" featuring half-price beer are commonplace. Powerful automobiles, operated by minors, are commonplace.
Beer and wine are every bit as capable of causing inebriation as hard liquor. Whether the damage is caused by a retailer who sells hard liquor to a minor or by one who sells beer to a minor, the injury and suffering that could be the proximate result would be the same.
To hold, as Convenience asks us to, based on precedent that was established a century ago when circumstances were vastly different, and then to buttress that holding on an adherence to technical definitions not applicable to the Civil Damages Act, would visit a great injustice on both society and the law. The law should not permit such an artificial distinction between beer and wine on the one hand, and distilled liquor on the other, for the purpose of giving meaning to the term "spirituous liquors" as it is used in the Civil Damages Act.
The judgment of the trial court as to Mr. Espey's claim under § 6-5-70 is in error. In regard to his claim, that judgment is due to be reversed and the cause remanded.
 II. The Plaintiffs' Action Pursuant to the Dram Shop Act.
Both Mr. Espey and his son Jimmy assert claims pursuant to § 6-5-71, Alabama's "Dram Shop" Act, based on Connie's intoxication. Mr. Espey argues that he also asserted a claim under § 6-5-71 based on Jimmy's intoxication. Section6-5-71 provides in pertinent part:
 "(a) Every wife, child, parent or other person who shall be injured in person, property or means of support by any intoxicated person or in consequence of the intoxication of any person shall have a right of action against any person who shall, by selling, giving or otherwise disposing of to another, contrary to the provisions of law, any liquors or beverages, cause the intoxication of such person for all damages actually sustained, as well as exemplary damages."
(Emphasis added.)
As to Mr. Espey's alleged claim based on Jimmy's intoxication, the record indicates that Mr. Espey did not assert such a claim. The count setting out the plaintiffs' claim under § 6-5-71 identifies Connie Price as the intoxicated person that caused the plaintiffs' injuries. That count does not even allege that Jimmy Espey's own intoxication contributed to his injuries. In fact, nothing in the entire record can reasonably be read to assert a claim on behalf of James under § 6-5-71 arising from the intoxication of his son.
As to the plaintiffs' claims based on Connie's intoxication, we find the wording of the statute itself dispositive. The statute provides a cause of action against "any person who shall, by selling, giving or otherwise disposing of to another,contrary to the provisions of law, any liquors or beverages, cause the intoxication of such person."
Convenience sold the beer to Jimmy, not Connie; that is undisputed. The sale to Jimmy was contrary to the provisions of law, but the claim involved in this appeal involves the alleged disposition of beer to Connie. Although it may be argued with some merit that Convenience "otherwise dispos[ed]" of the beer to Connie, we will not hold that Convenience's sale of the beer to Jimmy, who then gave it to Connie, was a disposition of the beer to Connie by Convenience that was "contrary to the provisions of law." Consider this example. A clerk sells beer to an adult, who can legally buy the beer, and that adult later gives the beer to a minor. The clerk in the example has no right to refuse to sell the beer to the person legally entitled to buy it. According to the plaintiffs' argument, although the sale itself was legal, the retailer would be liable for selling the beer "contrary to the provisions of law." Such a holding would for all practical purposes impose strict liability on retailers of alcohol; we *Page 1233 
expressly reject such a holding.[4]
The judgment of the trial court as to the plaintiffs' claims made pursuant to § 6-5-71 is due to be affirmed.
The judgment is affirmed in part and reversed in part, and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS and INGRAM, JJ., concur.
STEAGALL, J., concurs in the result.
HOUSTON, J., concurs in part and dissents in part.
[1] Convenience bases its argument primarily on the concurrence in Laymon. That concurrence also argued as authority for its position five dictionaries' definitions of the term "spirituous liquor." Although there may be instances when it is necessary to base a judgment on such definitions, our discussion will show that that is an unduly narrow approach in this situation.
[2] Mobile leaders warned that if the statewide prohibition legislation passed, Mobile would secede from Alabama and establish home rule. Sellers, supra, at 121. They did not attempt to do so, however, when the legislation passed.
[3] Indeed, to read the Civil Damages Act to apply only to the sale of distilled liquors might well make the statute facially violative of the equal protection provisions of the United States and Alabama Constitutions.
[4] In regard to the plaintiffs' § 6-5-71 claim based on Connie's intoxication, the trial court wrote:
 "As to the claim under 6-5-71, considering the evidence most favorably to the plaintiffs there is no evidence that the defendant furnished alcohol to the minor who caused the injury i.e. Connie Price. There was evidence that the defendant's clerk, who sold the beer, could have seen Connie Price if she had looked out the window of the store and thereby determined that Connie Price was a minor and that she could have been expected to consume the beer. However, there is no evidence that the clerk looked out the window or that she saw Connie Price. Therefore, there is no substantial evidence before the court to support the plaintiffs' claim that the defendant furnished beer to the minor who caused the injury as claimed under 6-5-71."
The trial court's use of the word "furnishing" in relation to § 6-5-71 does not precisely track the language of that provision, which states instead that "selling, giving or otherwise disposing of any liquors or beverages" is the basis for creating liability under § 6-5-71. That is an important distinction in terminology, because the term "furnishes" under the Civil Damages Act has a particular significance:
 "We interpret the words 'furnishes and furnishing' in § 6-5-70 to extend liability under § 6-5-70 to a seller or furnisher of spirituous liquors, who, from the totality of the circumstances, must reasonably infer that the person to whom the spirituous liquor is sold or furnished will permit a minor to consume some of this spirituous liquor."
Laymon v. Braddock, 544 So.2d 900, 904 (Ala. 1989).
The bench and bar should understand that Laymon's
"totality of the circumstances" test is specifically related to the terms "furnishes" and "furnishing" in § 6-5-70,Laymon, at 904, and that we have not yet applied a "totality of the circumstances" test to Dram Shop actions. That said, we understand that the trial court's use of the word "furnish" may have been a generic use of the word, as in to "provide," which was not related to Laymon's specific meaning; indeed, on occasion, we have also used the terms "furnish" and "provide" in such a generic way in relation to § 6-5-71. James v. Brewton Motel Management, Inc.,570 So.2d 1225 (Ala. 1990); Parker v. Miller BrewingCo., supra, 560 So.2d at 1033. By addressing only one portion of the trial court's holding in this footnote, we do not necessarily hold that the remainder of the trial court's holding was proper.